# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARK MCGEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:04CV1550MLM** |
| | ) | |
| **PUBLIC WATER SUPPLY DISTRICT #2** | ) | |
| **OF JEFFERSON COUNTY, MISSOURI,** | ) | |
| **STEVEN CONLEY, THOMAS THORNTON,** | ) | |
| **WALTER LEE, and DAVID HUTCHINGS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter is before the court pursuant to the Motion for Summary Judgment filed by Defendants Public Water Supply District #2 of Jefferson County, Missouri, ("PWSD") Steven Conley, Thomas Thornton, Walter Lee, and David Hutchings. Doc. 36. Plaintiff has filed a Response. Doc. 52. Defendant has filed a Reply. Doc. 55. Also before the court is the Motion to Strike filed by Plaintiff. Doc. 47. Defendants filed a Response to the Motion to Strike. Doc. 49. Plaintiff filed a Reply to the Motion to Strike. Doc. 50. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 6.

## MOTION TO STRIKE

Defendants have relied upon affidavits in support of their Motion for Summary Judgment and their Statement of Undisputed Facts. Plaintiff asks this court to strike portions of the affidavits of PWSD Board Members Conley, Thornton, and Lee and the affidavits of Thomas Dismuke and Brian Allen. In support of his Motion to Strike Plaintiff states that these affidavits include inadmissable hearsay and that statements contained in these affidavits are not directed to the issues

in this matter. Plaintiff also argues that Defendants admit in their answer that Plaintiff was terminated because his position with PWSD was eliminated and that, therefore, statements made in affidavits regarding the reasons for Plaintiff's termination are not admissible. The court first notes that it is clear from the context of deposition testimony and affidavits that while Defendants contend that Plaintiff's position was eliminated they also claim numerous reasons why the position was eliminated. These reasons address aspects of Plaintiff's performance as District Manager of PWSD. The court finds, therefore, that statements made in affidavits regarding the reasons for the elimination of Plaintiff's position are admissible. The court further finds that other statements which Plaintiff contends are hearsay are admissible for the reasons set forth in Defendants' Response to the Motion to Strike. As such, to the extent that Plaintiff neither admits nor denies the allegations of Defendants Statement of Undisputed Facts based on his Motion to Strike, said allegations are deemed admitted unless otherwise denied. Fed. R. Civ. P. Rule 56.

## UNDISPUTED FACTS[1]

Plaintiff was hired as District Manager of PWSD on January 13, 2003, as an at-will employee and did not have an employment contract. At the time Plaintiff was hired it had been three years since PWSD employed a district manager. PWSD Board of Directors made the decision to have a District Manager in 2003 because three existing Board members were preparing to resign. Plaintiff described his responsibilities as District Manager to include acting as a liaison for the Board of Directors of PWSD and supervising employees and equipment. It was also Plaintiff's job to inform PWSD Board of legalities, requirements, and statutes. Plaintiff received a pay raise in January 2004. Defendants contend that this pay raise was not a merit raise and that it was based on information received

---

[1] The facts are undisputed unless otherwise stated.

regarding salaries paid for comparable positions.  Plaintiff neither admits or denies this statement regarding the reason for his pay raise. Minutes of the PWSD Board dated January 20, 2004, reflect that Plaintiff completed his MBA and asked the Board for a review for a possible raise.  Minutes further reflect that the Board discussed this matter and decided to raise Plaintiff's salary to $55,000. Def. Ex. S. Plaintiff's position with PWSD was eliminated by a unanimous vote of the Board on August 19, 2004. Plaintiff alleges that his position was eliminated and that he was terminated because he engaged in constitutionally protected speech in violation of the First Amendment and 42 U.S.C. § 1983.

At the time Plaintiff joined PWSD employees were organized into three groups: the water treatment plant employees, the distribution employees who dealt with pipes and delivery, and administrative employees.  Brian Allen was in charge of the water treatment plant.  Robert Lambert was in charge of the pipe maintenance and water meter distribution group, and Kathy Wofford was in charge of the administrative group.

PWSD Board Member Richard Benner states in his deposition that conflicts which Plaintiff had with other PWSD employees were addressed at Board meetings some time before August 2004. Def. Ex. D at 34.  Board Member Benner further states that Plaintiff "generally butted heads" during Board meetings with Tom Dismuke, a civil engineer who had a long term relationship with  PWSD. Def. Ex. D at 37.   Plaintiff was asked by the Board on at least one occasion to try to resolve conflicts which he had with employees and acknowledged that prior to his being terminated by the PWSD he had discussions with Board members regarding his relationships with people. Def. Ex. A at 81.  Board Member Benner testified in his deposition that Plaintiff was counseled regularly by Board members to improve his relations with professional colleagues.  Def. Ex. D at 47.

Ms. Wofford left PWSD in the fall of 2003. Plaintiff testified in his deposition that Ms. Wofford quit her job; that she wrote a letter stating why she quit; that he did not see this letter; and that he was told that she said in this letter that she quit because of Plaintiff and that Plaintiff was a "jerk." Def. Ex. A at 54-55. Plaintiff further testified that he first felt tension between Ms. Wofford and himself "within the first few weeks of employment." Def. Ex. A at 56.

Plaintiff also testified in his deposition that he had a conflict with Dwayne Duvall, a contractor for PWSD, and that he was instructed by the Board to work with Duvall. Def. Ex. A at 81-82.

Board Members Conley, Benner, Thornton, Lee, and Hutchings believed that Board meetings ran too long while Plaintiff was the manager. Plaintiff testified in his deposition that he agreed with them in this regard; that meetings lasted from three to four hours; and that he thought they should not last more than approximately one hour. Def. Ex. A at 70-71.

The Missouri Department of Natural Resources ("DNR") is responsible for enforcing and implementing all Safe Drinking Water Act and Federal Environmental Protection Agency ("EPA") regulations and guidelines in Missouri. It is appropriate for individuals to direct questions about federal EPA regulations to the Missouri DNR.

The PWSD Board was pleased with Tom Dismuke's job performance as a civil engineer. Plaintiff brought to the Board's attention his belief that the septic system for the water treatment plant was not working properly and was creating a problem with sewage on PWSD's property. Based on Plaintiff's expressed concern about the septic system, the Board hired a plumbing contractor, AA Quick, and Civil Engineer Dismuke, to fix the septic system. Plaintiff, however, asked the Board to consider hiring a civil engineer other than Dismuke. Brian Allen, who was in charge of the water treatment plant, stated in an affidavit that Jefferson County approved the repairs; that after the initial

4

repairs were made the septic tank filled up more quickly than expected; that a television camera was inserted into the septic system to ascertain why this occurred; and that it was learned that a pipe improperly directed the groundwater into the septic tank. The problem with the pipe was corrected and a "no-discharge septic tank" with an alarm was installed. After the repairs were made Plaintiff asked Board Members Benner and Thornton and Civil Engineer Dismuke to look at the septic system, which they did on August 16, 2004. Plaintiff claimed the septic system was not fixed because the area was wet, because there was algae growing in the area, and because of the smell. Civil Engineer Dismuke advised the group that the septic system was fixed.

Plaintiff alleges and Defendants deny that a heated conversation took place at this time regarding the obligation of PWSD to comply with environmental laws. It is undisputed that even though Plaintiff had never driven a bulldozer he said that he was going to get a bulldozer and "put a lot of dirt over that area to simply try to prevent the sewage from erupting through the ground." Def. Fact #87. Plaintiff had not consulted with a professional to determine whether or not his plan to bulldoze the dirt would correct the perceived problem. After Dismuke responded that there was not raw sewage present, Plaintiff testified in his deposition that Board Member Thornton then said that Plaintiff did not need to be involved and that at that point Plaintiff said that "[w]hile I'm here as district manager, I will not do anything illegal, and that's a sewer mess in the middle of the water treatment plant." Def. Ex. A at 153. It is undisputed that Thornton then said that Plaintiff thought that Plaintiff was "building a dynasty" and/or "a goddamn dynasty" and that Thornton then turned and walked away. After Thornton's mentioning a dynasty, Plaintiff testified that Board Member Thornton also said that he would "see about that." Def. Ex. A at 195. Board Member Benner testified in his deposition that Defendant Thornton said that if Dismuke said "it was okay, then it was

okay." Def. Ex. D at 40-41. Plaintiff never spoke to any agency including the DNR and the Corps of Engineers about his claimed belief that raw sewage from PWSD was contaminating the creek after the repairs were made. The only conversations Plaintiff had with anyone about this concern were with Board Members Thornton and Benner and with Civil Engineer Dismuke. Plaintiff is unaware of any citation which PWSD received from any federal agency for an environmental violation.

In his Complaint Plaintiff alleges that on August 18, 2004, he learned from Public Works Project Manager Engel that an asbestos-cement water supply pipe beneath New Sugar Creek Road had been cut and that he "later expressed" his conclusion that testing other than what had been done was required. Compl., ¶ 19. Plaintiff also alleges that on or about August 18, 2004, an employee of PWSD cut the asbestos-cement pipe beneath Old Sugar Creek Road and expressed a concern to Plaintiff regarding proper employee protection measures. Compl., ¶ 19. Plaintiff further alleges that before August 19, 2004, he expressed to Board Member Benner concerns that an employee had cut an asbestos-cement water supply pipe and that Director Benner repeated this to other members of the Board of Directors of the PWSD. Compl., ¶ ¶ 20-21.

While Plaintiff was District Manager, PWSD had a project at New Sugar Creek Road where asbestos pipes had to be removed in order to regrade and realign the roadway. The Board hired Civil Engineer Dismuke to perform the engineering work on the New Sugar Creek Project and make sure testing was done. The water main was originally constructed of asbestos concrete. Civil Engineer Dismuke suggested cutting the pipe and reusing old sections rather than replacing the entire main and advised the Board that the cost of reusing existing sections was cheaper than replacing the entire line. The Board was very cost conscious, responsible with its finances, and careful of how it spent money. Plaintiff told the Board that he was in favor of replacing the entire water main along New

Sugar Creek Road rather than implementing Civil Engineer Dismuke's proposed plan. The Board voted to implement Civil Engineer Dismuke's plan rather than the plan advocated by Plaintiff. PWSD paid for an independent contractor to do the construction work at the New Sugar Creek Project. Civil Engineer Dismuke stated in an affidavit that he checked with the Missouri DNR to find out what testing was required for asbestos on the New Sugar Creek Project and that he was told by the DNR that it was unnecessary to test for asbestos when cuts were made. A sample test was conducted. Plaintiff was not aware whether the appropriate testing had been done.

Brian Allen, the manager of the treatment plant, states in an affidavit that in early 2004 Plaintiff provided him with information about asbestos testing; that Allen then called the DNR to determine what PWSD's responsibilities were; that he was told by Terry Timmons, monitoring chief for the DNR, that there were no asbestos problems in the area; that asbestos testing was based on whether the water had a stable index or an aggressive index, with stable index having a higher pH index; that in the case of the New Sugar Creek Project Timmons would not be concerned as long as the lines were properly flushed; and that the lines need not be tested ever time the pipe was cut. Def. Ex. H at 77- 81. Allen also states in an affidavit that a sample test indicated that the water was free of asbestos.

In his deposition Plaintiff testified that on August 16 or 17, 2004, an employee was covered with asbestos when a pipe was cut; that Plaintiff saw this happen; and that on the day this happened or the next day Plaintiff expressed to Board Member Benner his concern about asbestos in the drinking water. Def. Ex. A at 186-191. In his deposition Plaintiff also testified that on numerous occasions he addressed the Board about the health risks of asbestos in the drinking water and the need for testing the water; that federal regulations required that "it had to be monitored"; that fact

that "so many cuts" were made in the water pipe; and that "we needed to insure the public safety." Def. Ex. A at 191-92. Plaintiff could not recall the exact date upon which he last spoke to a Board member concerning the need for the drinking water to be free of asbestos other than to say that it was "[s]ometime during 2004." Def. Ex. A at 192. Plaintiff also testified that he "probably" had conversations with individual Board members regarding the topic of asbestos in the drinking water. Def. Ex. A at 193.

Plaintiff alleges that Board Member Conley was predisposed to unlawfully retaliate against Plaintiff because Plaintiff had earlier spoken in the Board's presence on matters of public concern affecting Conley's interest in benefitting from a public works project of PWSD. Board Member Conley stated in his deposition that he inquired and spoke to the Board about extending the water line to his subdivision and that he suggested the installation of a fire hydrant on the street. Plaintiff told Board Member Conley that he did not believe that PWSD should become involved in supplying parts for the fire hydrant or to provide any additional benefits to the public in the area. Conley stated in an affidavit that Plaintiff's comments to him about the improvements in the water system in Conley's subdivision did not enter into his decision to vote to eliminate Plaintiff's position. Plaintiff alleges that he told Board Member Benner, the Board, and Conley that Conley needed to be cautious. Plaintiff testified in his deposition that Public Works Project Manager Byrl Engles indicated that Conley was trying to get special favors for his residence. Plaintiff could not state what these favors were nor could he elaborate regarding what Engles told him. Def. Ex. A at 209.

Plaintiff testified in his deposition that Board Member Hutchings brought up at two separate Board meetings that he would like to be considered for a position as a meter reader with PWSD and that Plaintiff told Hutchings that he would have to resign as a Board member in order to be

considered for this position. Def. Ex. A at 206. Hutchings stated in his deposition that he knew that he would have to step down from the Board if he went through the process of applying for a position as a meter reader and that he decided not to apply. Any conversations he had with Plaintiff over employment did not affect Hutchings decision to vote to eliminate the District Manager position.

After learning of Plaintiff's confrontation with Board Member Thornton regarding covering the treatment plant property with dirt, Hutchings called for a special meeting of the Board to discuss the need for the District Manager position. In an affidavit Board Member Thornton states that Plaintiff did not handle employees who worked under him well; that Plaintiff wanted to run PWSD by himself and he planned things without the Board's authority; that employees did not like working for Plaintiff; that Kathy Wofford quit her job with PWSD because she could not work with Plaintiff; that Board meetings became longer after Plaintiff was hired by PWSD; that Plaintiff criticized the Board's choice of an engineer; that Plaintiff spent too much of PWSD's money on expenses including taking people out to lunch; and that Plaintiff went out of town in the summer of 2004 without telling the Board and other people with PWSD. Def. Ex. L, Thornton Aff., ¶¶ 6-11. Board Member Thornton further states that he told the Board in July 2004 that he thought Plaintiff's credit card expenses were too high and that he spent too much money on lunches and that in his opinion Plaintiff made unnecessary long distance telephone calls. Def. Ex. L, Thornton Aff., ¶¶ 14-17.

Minutes of the Board for August 19, 2004, state that a meeting was called to discus the need for a district manager position. Minutes further state that Board Member Hutchings felt that "the meetings are becoming increasingly contentious"; that he felt for Plaintiff "not to know what was going on at the tower was unacceptable"; and that he did not think that Plaintiff is a manager. Minutes also state that Board Member Thornton "ha[d] documents of discounted bills," that he "[did

9

not] feel that [Plaintiff was] a good manager," and that he "had copies of charge accounts with

questionable expenses." Minutes also state that Board Member Conley did not "feel that [Plaintiff]

[was] the appropriate person for the position. He listed his frustrations with meter installations, no

control of distribution and his persistence to get what he wants." Def. Ex. M. Minutes reflect that

upon a motion from Board Member Hutchings Board Members Conley and Lee voted to terminate

Plaintiff immediately with a thirty-day severance package; that Board Member Benner voted against

the motion; and that upon a second motion, the Board Members voted unanimously to terminate

Plaintiff. Def. Ex. M.

### STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The

substantive law determines which facts are critical and which are irrelevant. Only disputes over facts

that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota,

Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the

evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion.

Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must

set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not

the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. <u>Anderson</u>, 477 U.S. at 256.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. <u>Id.</u> at 255; <u>Raschick v. Prudent Supply, Inc.</u>, 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. <u>Anderson,</u> 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." <u>Id.</u> at 252. With these principles in mind, the court turns to an analysis of Defendants' Motion for Summary Judgment.

## LEGAL FRAMEWORK

The two essential elements of a cause of action pursuant to the Civil Rights Act, 42 U.S.C. § 1983 are: "'(1) whether the conduct of which the plaintiff complains "was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" <u>DuBose v. Kelly</u>, 187 F.3d 999, 1002 (8th Cir. 1999)(citations omitted).

A public employer's "[d]iscrimination against speech because of its message is presumed to be unconstitutional." <u>Rosenberger v. Rector and Visitors of the Univ. of Virginia</u>, 515 U.S. 819, 828 (1995) (citation omitted). Moreover, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." <u>Id.</u> at 829. "'In order to establish a claim for unlawful First Amendment retaliation, a public employee must show that [he] suffered an adverse employment action that was causally

connected to [his] participation in a protected activity.'" Myers v. Starke, 420 F.3d 738, 744 (8th Cir. 2005) (quoting Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir.2002)).

The Eighth Circuit holds that "'[i]t is clearly established that a [public employer] may not discharge an employee on a basis that infringes [upon] that employee's constitutionally protected interest in freedom of speech.'" Sexton v. Martin, 210 F.3d 905, 910 (8th Cir. 2000) (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)). "The First Amendment is violated when a public employee is terminated as a result of his speech if the employee's speech can be characterized as speech about a matter of public concern." de Llano v. Berglund, 282 F.3d 1031, 1036 (8th Cir. 2002) (citing Connick v. Myers, 461 U.S. 136, 146 (1983)). Whether speech is a matter of public concern is a question of law for the court to decide. See id. (citation omitted). Upon considering this issue a court must "examine the speech's content, form, and context." Bausworth v. Hazelwood School Dist., 986 F.2d 1197, 1198 (8th Cir. 1993) (citing Connick, 461 U.S. at 147-48). "'The form and context are examined to determine whether the public employee speaks as a concerned citizen informing the public that the government is not properly discharging its duties, or merely as an employee speaking [a]bout internal practices relevant only to fellow employees.'" de Llano, 282 F.3d at 1036 (quoting Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1117(8th Cir. 1997)). The focus of the court's inquiry is "the employee's role in conveying the speech rather than the public's interest in the speech's topic." Id. (citing Terrell v. University of Tex. Sys. Police, 792 F.2d 1360, 1362 (5th Cir.1986)). "Thus, speech is a matter of public concern when a public employee speaks as a concerned citizen, but not when the employee speaks as an employee." Id. Upon determining whether an employee was speaking on a matter of public concern the court's focus is on "whether the employee attempted to communicate the speech to the public at large and the employee's

motivation in speaking." Bausworth, 986 F.2d at 1998. Speech is not protected if it "was mostly intended to further the employee's private interests rather than to raise issues of public concern ... even if the public might have an interest in the topic of [the] speech." Schilcher v. Univ. of Arkansas, 387 F.3d 959, 963 (8th Cir.2004) (citing Sparr v. Ward, 306 F.3d 589, 594-95 (8th Cir.2002)). See also Washington v. Normandy Fire Protection Dist., 272 F.3d 522, 526 (8th Cir. 2001) (citing Sexton, 210 F.3d at 910) (quoting Connick, 461 U.S. at 146) ("[W]hether [the plaintiff's] First Amendment rights were violated depend[ed] upon whether his comments during the radio interview constituted 'speech on a matter of public concern.'"). When a plaintiff conveys the allegedly protected speech in the course of acting as an employee, the plaintiff fails to establish a First Amendment violation. Bausworth, 986 F.2d at 1198. "It is not enough to say that a particular topic or subject is, at some level of abstraction, a matter of public concern." Schilcher v. Univ. of Arkansas, 387 F.3d 959, 963 (8th Cir.2004). Where an employee's is "primarily" speaking to further the employee's private interests, his or her speech is not protected. Id. On the other hand, the Eighth Circuit has suggested that it is possible to establish such a violation where the employee "sought to make a public issue" of a mistake by his or her employer. Bausworth, 986 F.2d at 1199.

Once it is determined that the speech at issue is a matter of public concern, the court considering a motion for summary judgment, must balance the plaintiff's "'right to free speech against the interests of the public employer.'" Id. (quoting Sexton, 210 F.2d at 910) (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)). See also Meyers v. Starke, 420 F.3d 738, 741 n.2 (8th Cir. 2005) ("Even if [the plaintiff] spoke out on a matter of public concern, her interests are outweighed 'if the [defendants] show that [the] speech so severely damaged office harmony and

13

working relationships that [the defendant's] interest in promoting an effective workplace outweighs [the plaintiff's] First Amendment rights.' ... The employer bears the burden of proving that the balance of interests weighs in its favor.") (citations omitted). "[I]f the governmental employer cannot produce some evidence showing that the employee's speech *disrupted* the workplace, the court need not proceed to the balancing stage, absent special circumstances." Gordon v. City of Kansas City, 241 F.3d 997, 1003 (8th Cir. 2001) (emphasis in text) (citations omitted). See also Washington, 272 F.3d at 526 ("The Pickering balancing test is applicable, however, only if it is first established that the speech in question created a disruption in the workplace.").

The Eighth Circuit further holds that if the speech at issue is constitutionally protected, "the plaintiff then bears the burden of showing that the protected speech was a substantial or motivating factor in the decision to terminate him." [2] de Llamo, 282 F.3d at 1036 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). See also Horton v. Taylor, 767 F.2d 471, 481 (8th Cir.1985). This question is one of fact, "but the sufficiency of the evidence to create an issue of fact is a question of law." de Llamo, 282 F.3d at 1036 (citing Cox v. Miller County R-I Sch. Dist., 951 F.2d 927, 931 (8th Cir. 1991)). Even if a plaintiff establishes that he or she engaged in protected speech but a mixed motive is shown for the dismissal of the plaintiff, summary judgment will be granted for the plaintiff's employer where it is shown that "the plaintiff would have been discharged in any event." Langley v. Hot Springs County, 393 F.3d 814, 817 (8th Cir. 2005) (citing Horton, 767 F.2d at 481) (other citation omitted). Where an employee is discharged for mixed

---

[2]     Case law which Plaintiff cites in opposition to Defendant's Motion for Summary Judgment, in particular, in support of his claim that Defendant's retaliated against him, is inapplicable to the matter under consideration as such case law sets forth the analysis applicable to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

motives, one implicating first amendment interests including speech and "one or more being unrelated to the first amendment," then it must be determine whether the employee "'would have been discharged in any event for reasons unrelated to any exercise of protected first amendment rights.'" Horton, 767 F.2d at 481(8th Cir. 1985) (citing Mt. Healthy, 429 U.S. 274) (quoting Jones v. Dodson, 727 F.2d 1329, 1335 (4th Cir. 1984)).

Qualified immunity protects a government official from suit when his or her conduct does not "'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sexton, 210 F.3d at 909 (8th Cir. 2000) (quoting Harlow v. Fitzgerald, 475 U.S. 800, 818 (1982)). In Saucier v. Katz, 533 U.S. 194 (2001), the United States Supreme Court addressed the requisites of a qualified immunity defense. The Court held that the "threshold question" in a qualified immunity inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. The Court continued to state that:

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established. This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. See also Andrews v. Fuoss, 417 F.3d 813, 816 (8th Cir. 2005); Littrell v. Franklin, 388 F.3d 582 (8th Cir. 2004) ("The 'existence or nonexistence of a constitutional right' is, therefore, the threshold question.") (quoting Saucier, 533 U.S. at 201).

## DISCUSSION

Plaintiff alleges that he was terminated because he spoke about the sewer system and the

water supply which speech Plaintiff alleges was constitutionally protected. Plaintiff also alleges in his Complaint that Defendants Conley and Hutchings were motivated to terminate his position based on "other such incidents" and because Plaintiff "earlier spoke[] in the Board's presence on matters of public concern affecting Conley's interest in benefitting from a public works project" and the need for Hutchings to resign from the Board if he wanted to be a meter reader. Doc. 1, Count 1, ¶ B.[3] Also, in his Response to Defendants' Motion for Summary Judgment Plaintiff argues that his position was eliminated and he was terminated because he spoke about the installation of a water line and fire hydrant in the subdivision in which Board Member Conley lives and because at two Board meetings he addressed the fact that Board Member Hutchings would have to resign from the Board if he wanted to be considered for a position as a meter reader. Defendants contend that Plaintiff's position was eliminated and suggest several reasons why Board members voted to do so. Defendants allege that PWSD was displeased with Plaintiff's performance for reasons including: he did not handle employees who worked under him well; Plaintiff wanted to run PWSD by himself and he planned things without the Board's authority; employees did not like working for Plaintiff; Kathy Wofford quit her job with PWSD because she could not work with Plaintiff; Board meetings became longer after Plaintiff was hired by PWSD; Plaintiff criticized the Board's choice of an engineer; Plaintiff spent too much of PWSD's money on expenses including taking people out to lunch; and Plaintiff went out of town in the summer of 2004 without telling the Board and other people with PWSD. Defendants contend that Plaintiff's position was not eliminated and he was not terminated

---

[3]     In Count I of his Complaint Plaintiff alleges First Amendment Retaliation by PWSD and in Count II he alleges a First Amendment Retaliation by Defendant Board Members Conley, Thornton, and Hutchings. Plaintiff makes no individualized allegation against Defendant Board Member Lee. Defendant Board Member Thornton's motivation is addressed regarding the incident involving repair of the sewage system.

because he engaged in constitutionally protected speech. Defendants further contend that they are entitled to qualified immunity.

The court finds that the undisputed facts establish that Plaintiff's position was terminated for numerous reasons. The court finds that the undisputed facts establish that Board Member Conley did not retaliate against Plaintiff because Plaintiff spoke at Board meetings regarding extending the water line to or installing a fire hydrant in Conley's subdivision. In fact, Plaintiff admits Conley's statement in this regard and does not submit facts to refute Conley's statement. Def. Facts, ¶115; Pl.'s Resp. Def. Facts, ¶ 115; Pl.'s Facts, ¶¶ 1-36. The court further finds that the undisputed facts establish that Board Member Hutchings did not retaliate against Plaintiff for stating that Hutchings could not work as a meter reader while he was a member of the Board. Likewise, Plaintiff admits Hutchings' statement in this regard and does not submit facts to refute Hutchings' statement. Def. Facts, ¶ 118; Pl. Resp. Def. Facts, ¶ 118; Pl. Facts, ¶¶ 1-36.[4]

The court will assume, arguendo, that the reasons Plaintiff's position was terminated include the statements Plaintiff allegedly made regarding the repair of the sewer system and those he made regarding the asbestos pipes. In the event that this speech was not constitutionally protected, the court's inquiry need proceed no further and summary judgment should be granted in favor of Defendants. See Du Bose, 187 F.3d at 1002. As stated above, it is the court's role to determine

---

[4]     While the public would be concerned about favors granted to a Board member such as extending the water line to and installing a fire hydrant in Board Member Conley's subdivision and would be concerned about Board Member Hutchings' working as a meter reader, the undisputed facts establish that Plaintiff was speaking as an employee of the PWSD and not as a concerned citizen when he addressed these matters. See Schilcher, 387 F.3d at 963; de Llano, 282 F.3d at 1036. As such, were the court to consider whether Plaintiff's speech regarding Board Members Hutchings and Conley was constitutionally protected, the court would conclude that it was not.

as a matter of law whether Plaintiff's speech was constitutionally protected. See de Llano, 282 F.3d at 1036. Pursuant to such an inquiry the court must first consider whether the undisputed facts establish whether or not the Plaintiff was speaking on a matter of public concern. This inquiry requires that the court determine whether Plaintiff was speaking as a concerned citizen or as an employee of PWSD. See id.; Bausworth, 986 F.2d at 1198. Only if Plaintiff was speaking as a concerned citizen was his speech protected. See de Llano, 282 F.3d at 1036. As stated above, this inquiry requires that the court consider the context of Plaintiff's speech. See Bausworth, 986 F.2d at 1198.

In regard to Plaintiff's alleged comments regarding sewage, Plaintiff spoke in the course of examining  repairs and he spoke only to Defendant Thornton and to the engineer employed by PWSD, Tom Dismuke. During this conversation, which Plaintiff characterizes as heated, Plaintiff contends that he said that illegal acts would not be allowed and that he would take measures to assure that repairs were made by renting equipment and performing excavation himself to assure that sewage did not enter the river. Plaintiff was expressing his view that the repairs were not being done properly. While the safety of the public water supply is a matter over which citizens would have concern, Plaintiff's speech on this topic is not necessarily constitutionally protected. See Schilcher, 387 F.3d at 963. Significantly, Plaintiff did not act upon nor publicize his alleged concern over the safety of the public water supply and he made no attempt to communicate with the public at large regarding this concern. He did not express his concerns nor report the situation to either the Missouri DNR or the  EPA. Moreover, during the conversation on August 16, 2004, regarding the septic system Plaintiff stated specifically that he was speaking as district manager; he said that while he was district manager he would not do anything illegal. Moreover, Plaintiff acknowledges that his

duties as District Manager included an obligation to assure that PWSD complied with environmental laws. See Bausworth, 986 F.2d at 1198. As such, the court finds that the content, form, and context of the statements made by Plaintiff regarding the septic system establish that Plaintiff was furthering his private interests as an employee of the PWSD; that he was speaking as an employee of PWSD; that he was carrying out his duties as District Manager; that he was addressing internal practices of the PWSD; and that Plaintiff was not seeking "to make a public issue" of a mistake which he believed his employer, PWSD, made. See de Llano, 282 F.3d at 1036; Bausworth, 986 F.2d at 1199. The court finds, therefore, as a matter of law, that when Plaintiff spoke regarding the sewer repair project he was not speaking to raise issues of public concern and that, as such, his speech was not protected. See id.

It is undisputed that the Board of PWSD implemented Dismuke's plan for repair of the asbestos-cement pipes despite Plaintiff's recommending that entire water main and/or the pipes be replaced. For purposes of summary judgment the court will assume that Plaintiff spoke to the Board and other Board members individually about the cutting of asbestos-cement pipes and that during the week of August 16, 2004, Plaintiff spoke to Board Member Benner about his concern regarding the cutting of an asbestos-cement pipe. Indeed, the presence of asbestos in the public water supply is a matter over which citizens would have concern. The interest of the public in this topic, however, does not establish that Plaintiff's speech was constitutionally protected. See Schilcher, 387 F.3d at 963. Significantly, Plaintiff did not act upon nor did he publicize his concern regarding danger of asbestos in the water supply nor did he express his concerns or report the situation to either the Missouri DNA or the EPA. When Plaintiff expressed his concerns about asbestos, about Dismuke's recommendation for the repair of the asbestos-cement pipes, and about the cutting of the asbestos-

cement pipes he did so only to the Board, to Board Member Benner and possibly to other Board members individually and was expressing his professional opinion as District Manager of PWSD. Indeed, Plaintiff acknowledges that his duties as District Manager included informing the Board of its obligation to comply with environmental laws. The court finds that the form and context of Plaintiff's speech regarding the possibility of asbestos in the water supply and the cutting of asbestos-cement pipe establishes that he was not speaking as a concerned citizen but rather was speaking and functioning as an employee who was performing his job and who was expressing his opinion regarding internal practices of his employer. See de Llano, 282 F.3d at 1036; Bausworth, 986 F.2d at 1199. The court finds, therefore, as a matter of law that when Plaintiff spoke regarding asbestos he was not speaking on a matter of public concern and that, as such, his speech was not protected. See de Llano, 282 F.3d at 1036.

Assuming for purposes of summary judgment that Plaintiff's position was eliminated because of his speech regarding the septic system and/or asbestos the court further finds because this speech was not constitutionally protected that Plaintiff's termination did not violate the First Amendment and/or § 1983. [5]

Additionally, the court finds, in the alternative, that even if the speech at issue is constitutionally protected, the undisputed facts do not establish that Plaintiff's speech was a substantial or motivating factor in the decision to eliminate his position and to terminate him; Plaintiff would have been terminated in any event for reasons other than his engaging in

---

[5] While Plaintiff's position was terminated within three days of the incident involving the septic system and within one or two days of Plaintiff's allegedly discussing the possibility of asbestos in the water supply with Board Member Benner, this proximity is not relevant to a determination of whether the elimination of Plaintiff's position violated his constitutional rights because Plaintiff did not engage in constitutionally protected speech.

constitutionally protected speech.  See Langley, 393 F.3d at 817; de Llano, 282 F.3d at 1036.  As

such, the undisputed facts establish that Plaintiff was not terminated in violation of his constitutional

rights and § 1983.  The court, therefore, need not address Defendants' argument that they are

entitled to qualified immunity.  The court further finds that summary judgment should be granted in

favor of Defendants.

## CONCLUSION

For the reasons more fully set forth above, the court finds that there are no genuine issues of

material fact and that summary judgment should be granted in favor of Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Strike is **DENIED**; Doc. 47

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is

**GRANTED**; Doc. 36

**IT IS FURTHER ORDERED** that a separate Judgment shall issue this same date

incorporating this Memorandum Opinion and granting Judgment in favor of Defendants.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 4th  day of  January, 2006.